UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| PAUL THOMAS HURTH, | ) | 1:05-CV-0597 OWW JMD HC |
| | ) | |
| Petitioner, | ) | ORDER SCHEDULING EVIDENTIARY |
| | ) | HEARING |
| v. | ) | |
| | ) | ORDER DIRECTING CLERK OF COURT |
| MICHAEL KNOWLES, | ) | TO CHANGE NAME OF RESPONDENT |
| | ) | |
| Respondent. | ) | |
| | ) | |

Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

Petitioner filed the instant petition on May 3, 2005. Petitioner argues, among other things, that his rights were violated when the jury improperly considered definitions of voluntary and involuntary manslaughter that were retrieved from an outside source rather than those contained in the jury instructions. Petitioner argues that he is entitled to an evidentiary hearing on the issue as he has established a prima facie case of juror misconduct.

A. Juror Misconduct

Petitioner bases his claim on juror interviews that were conducted by a private investigative service following his trial. (<u>See</u> Exhibits in Support of Petition.) Petitioner presented his claim and his request for an evidentiary hearing, along with the transcripts of the juror interviews, to the Fresno

County Superior Court in a petition for writ of habeas corpus. (Lodged Docs., Vol. 1, Ex. 7.) The court denied the claim finding that none of the jurors could identify the source of the definitions in question, that no juror saw a dictionary being used, and that one juror stated that clarification of the definitions was taken from the court's instructions. (Lodged Docs., Vol. 1, Ex. 8 at 10.) Petitioner presented the same claim to the California Court of Appeal, which also denied it finding that, for the most part, juror misconduct had not been shown and that, to the extent extraneous materials were introduced, they were not likely to have influenced any juror. (Lodged Docs., Vol. 1, Ex. 9; Ex. 10 at 1.) The California Supreme Court subsequently rejected the same claim without comment. (Lodged Docs., Vol. 1, Exs. 11-12.) None of the state courts granted Petitioner an evidentiary hearing.

"The standard governing [requests for an evidentiary hearing] establishes a reasonably low threshold for habeas petitioners to meet. A habeas petitioner is entitled to an evidentiary hearing if: (1) the allegations in his petition would, if proved, entitle him to relief; and (2) the state court trier of fact has not, after a full and fair hearing, reliably found the relevant facts. . . . In these circumstances, a petition may be dismissed without a hearing only when it consists solely of conclusory, unsworn statements unsupported by any proof or offer thereof." Phillips v. Woodford, 267 F.3d 966, 973 (9th Cir. 2001); see also Earp v. Ornoski, 431 F.3d 1158, 1167 (9th Cir. 2005) ("[W]here the petitioner establishes a colorable claim for relief and has never been afforded a state or federal hearing on this claim, we must remand to the district court for an evidentiary hearing."); Hendricks v. Vasquez, 974 F.2d 1099, 1103 (9th Cir. 1992) (stating that a hearing is not required if the state court reliably found the relevant facts or there are no disputed facts and the claim presents a purely legal question).

. "Juror misconduct occurs when a juror introduces into the jury's deliberations a matter which was not in evidence or in the instructions. No bright line test exists to assist courts in determining whether a petitioner has suffered prejudice from juror misconduct. We therefore place great weight on the nature of the extraneous information that has been introduced into deliberations. Furthermore, we cannot grant habeas relief on a juror misconduct claim unless we are convinced that the alleged error had a substantial and injurious effect on the verdict." Parkinson v. Cambra, 105 Fed.Appx.

185, 187 (9th Cir. 2004) (citations and quotation marks omitted).  When determining whether an error had such an effect, a court considers "(1) whether the extrinsic material was actually received, and if so, how; (2) the length of time it was available to the jury; (3) the extent to which the jury discussed and considered it; (4) whether the extrinsic material was introduced before a verdict was reached, and if so, at what point in the deliberations it was introduced; and (5) any other matters which may bear on the issue of  ... whether the introduction of extrinsic material [substantially and injuriously] affected the verdict."  <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 951-52 (9th Cir. 2002).

Petitioner's claim of misconduct is based on the following statements of Jurors White and Benzler:

> Q: I know that you stated to Mr. Carlson before that somebody brought in some form of definition if you will.
>
> [Juror White]: Yes.
>
> Q:  In what way...please describe that for me.
>
> A: Uh, I think...I don't know whether it was a dictionary or just written out on a piece of paper....I really don't remember very well.  I only remembered it after thinking about it after he had brought it up and um, but yes, I remember that somebody had brought it in...maybe even two people.  Um, and they just...I guess they just read it off the paper.  That's the best I can remember.
>
> Q: Do you remember which juror brought that document in?
>
> A: I don't remember who it was.  I know it was...I think it was one of the girls that sat across from me when we were in the deliberation room, but I don't remember who it was.  I don't remember if Del brought one in too.  I don't remember.
>
> Q: And it was just outlining or defining the differences between voluntary and involuntary manslaughter?
>
> A: I do believe that that's the word they were looking up.
>
> Q: And do you remember anybody stating where they had received that definition from or retrieved that definition from?
>
> A: I don't remember.

1  Q: O.K.  You don't remember if it was the dictionary or was it a copied page out of a dictionary?

3  A: I don't know.

4  Q: That's alright.

6  A: It didn't really mean much to me so I guess I didn't pay much attention to it.

7  . . .

9  Q: And as well, you recall somebody did bring in some form of definition if you will.

10  A: Yes.

11  Q: Of the differences in voluntary and involuntary manslaughter?

13  A: I believe that those were the words because that [is] the only thing I can remember.

15  Q: So did everybody look at those definitions?  Did it go around the table or something?

17  A: I think it was just read off.

18  Q: Do you remember who read it off?

19  A: I think it was Del that read it.

21  Q: What made you believe that it was a definition that was retrieved by somebody personally?

23  A: Well, after thinking about it I did remember that they had sent a request to the judge to get more information and that was his...one of his responses, to look it up ourselves.

25  Q: You are saying the judge actually told you to use a dictionary and look it up?

27  A: Just to look it up ourselves.

. . .

Q: O.K. And based on that definition that was obtained outside by a juror, was that definition relied on?

A: I don't know if it was relied on or supported what we had said[.]

Q: But it was used?

A: It was used.

Q: And it was taken as gospel, if you will, as it being what the true definitions were?

A: Well, yeah, because they didn't believe me and whoever else understood the meaning of it and so I would say yes, they did rely on that.

. . .

Q: They were actually looking at, from what you are stating, is the difference between voluntary and involuntary?

A: Yes

Q: And so both of those definitions were read off by you believe Del, who was the jury foreman?

A: Yes.

Q: And those definitions to your knowledge were not provided by the judge, because the judge said look it up on your own?

A: Yes.

(Exhibits in Support of Petition, Interview of White at 8-9, 16-19.)

Q: Let me ask you this, concerning that issue it is my understanding that there was some question with regards to the definition between voluntary and involuntary manslaughter, is that correct?

[Juror Benzler]: Huh-huh, right.

Q: And that your jury foreman requested a clearer definition if you will, from Judge

1    Sarkisian, is that a correct statement?

2    A: Huh-huh, yes.

3

4    Q: Was that adequately defined for you?

5    A: No.

6

7    Q: There was still some confusion?

8    A: Yes.

9

10   Q: Did anybody attempt to on their own, look up the definition of what the definition between voluntary and involuntary manslaughter were?

11

12   A: Um, I believe so. Um, let's see...I don't know how to word this. I know...I can't remember the exact words that we were trying to pick out that needed the clarification, but I believe people did on their own try to look up because the next day it seemed like uh, there were something said to the effect that well, this means da-da-da. And so we kind of had to uh...if the judge...let's put it this way. For me and I'm sure for others, if the judge would have answered that question directly, nobody would have had to uh, you know, go on their [own] to look it up.

13

14

15

16   Q: Did anybody bring a dictionary into the jury room?

17   A: I don't remember seeing a dictionary in there.

18

19   . . .

20   Q: Do you remember anybody reading a definition off of a piece of paper that wasn't provided by the court?

21

22   A: I can't recall that either.

23

24   Q: Do you remember anybody stating that they looked it up on the internet or asked a friend or used some form of reference material as to any of the definitions regarding the law?

25

26   A: No, I don't remember that either.

27

28   . . .

1  Q: But you have no idea if someone may have researched this information somewhere between the time you left for the evening and returned the following day?

2

3  A: Well, I'm sure they would have had to.

4

   Q: It appears to you that someone had to have researched that because suddenly the next day they had more information about this question that you had submitted to the judge?

5

6

7  A: Correct.

8

   Q: So somebody within that jury panel did some type of research somehow and came back with their, I guess I would say definition of the questions that you had?

9

10  A: Correct.

11

12  Q: And so they disregarded whatever instructions the judge had gave because you felt they were not clear, or I guess the jurors felt they were not clear?

13

14  A: Well, yeah.

15  Q: I'm just trying to make it clear[.]

16  A: Yeah.

17

18  Q: So basically your decision is based on something that somebody within the jury panel learned outside of the court process, outside the instructions being monitored by the judge that was hearing the case?

19

20  A: Yeah, for that one particular thing.

21

22  . . .

23  Q: Any other jurors state that they went home and looked something up?

24

25  A: I don't recall that.

26  Q: You also made mention that Dale Abercrombie, the jury foreman, had read a definition to the jury?

27

28  A: Huh-huh.

Q: Where did he obtain that definition?

A: I don't know.

Q: Is that something that was provided by the judge?

A: I don't think so because what I recall, whatever the judge wrote back was absolutely no help.

. . .

Q: You had made a comment about everybody had left and came back and had some kind of opinion.

A: No, no, I didn't say that.

Q: That's what I'm trying to figure out.

A: That wasn't it. What we were trying to get was the definition of the law, you know. How it was written it was not clear and we thought that would be a question that the judge could answer. It was a very simple question to me. Just define this so we can go and deliberate. He didn't do that. So, it kind of left us in the dark, you know, those that were trying to do the best we could with the evidence we had and so you know, whatever, in our discussions the next day...now, I looked up the one word and didn't say anything, but the next day other people had and didn't state where they got it but seemed to have a better knowledge of what we were looking at.

Q: And that's the questions I was going to ask. Did you have the impression that the other people suddenly the next day had a better knowledge of what it was that you had been trying to discover the day before?

A: Right.

Q: So it just appeared that some other people had also done some type of research?

A: Huh-huh, yeah, exactly.

(Exhibits in Support of Petition, Interview of Benzler at 7-8, 13-14, 17-19.)

The statements of Jurors White and Benzler raise a colorable claim of prejudicial jury misconduct, as both stated that, despite the fact the trial court failed to adequately define voluntary

and involuntary manslaughter, definitions for the terms were obtained, read off to the entire jury, and accepted as accurate. See Marino v. Vasquez, 812 F.2d 499, 505-06 (9th Cir. 1987) (finding that consulting a dictionary definition for the meaning of "malice" constituted improper consideration of extrinsic information); U.S. v. Morales, 108 F.3d 1213, 1222 (10th Cir. 1997) (finding that jury engaged in misconduct by researching definition of "distribution"). While it is not entirely clear that the definitions were specifically obtained from a dictionary, the statements of White and Benzler make clear that they were not obtained from the judge or the jury instructions. Further, absent an evidentiary hearing, the state courts were not in a position to make a credibility determination regarding the conflict between the statements of White and Benzler and the statements of Jurors Herzog and De La Cruz who stated that no outside definitions were used and that the jury clarified the issues using their own notes and the jury instructions. (See Exhibits in Support of Petition, Interview of Herzog at 9:16-10:8; Interview of De La Cruz at 7:18-8:14.) The state courts were also not in a position to determine whether Petitioner suffered prejudice due to misconduct, as the source and substance of the definitions were unknown and it was unclear to what extent the jury used the definitions during deliberations. See Mayhue v. St. Francis Hosp. of Wichita, Inc., 969 F.2d 919, 924 (10th Cir. 1992) (stating that factors relevant in determining prejudice caused by a jury's unauthorized consultation of a dictionary include the importance of the word to the resolution of the case, the extent to which the definition differs from the jury instructions, and the extent to which the jury discussed and emphasized the definition).

Accordingly, this Court will conduct an evidentiary hearing on the issue of the jury's consideration of extraneous definitions of voluntary and involuntary manslaughter. Rule 8(a) of the Rules Governing Section 2254 Cases; Townsend v. Sain, 372 U.S. 293, 313, 318 (1963).

B. Proper Respondent

Petitioner states that he is currently incarcerated at Mule Creek State Prison. (Petition at 1.) Respondent states that the warden of that institution is Rosanne Campbell. (Answer at 1 n.1.) Pursuant to Rule 25 of the Federal Rules of Civil Procedure, the Clerk will be directed to substitute Rosanne Campbell as Respondent in this matter.

For the foregoing reasons, the Court HEREBY ORDERS that:

1) an evidentiary hearing is ORDERED set for **April 28, 2009, at 8:45 a.m., before the undersigned**; and

2) The Clerk of Court is DIRECTED to substitute Rosanne Campbell as Respondent in this matter.

IT IS SO ORDERED.

**Dated:   July 14, 2008**                          /s/ John M. Dixon
                                         UNITED STATES MAGISTRATE JUDGE