1
2
3
4
5
6
7
8
9
10
11
12
13
14

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAUL THOMAS HURTH, ) | 1:05-CV-00597 OWW JMD HC |
| ) | |
| Petitioner, ) | FINDINGS AND RECOMMENDATION |
| ) | REGARDING PETITION FOR WRIT OF |
| v. ) | HABEAS CORPUS |
| ) | |
| ) | |
| ROSANNE CAMPBELL, Warden, ) | |
| ) | |
| Respondent. ) | |
| _____ ) | |

15      Petitioner is a State prisoner proceeding with a petition for writ of habeas corpus pursuant to

16  28 U.S.C. § 2254.

17                                    **BACKGROUND**

18      Petitioner is currently in the custody of the California Department of Corrections pursuant to

19  a judgment of the Fresno County Superior Court.  Petitioner was convicted by jury of voluntary

20  manslaughter (Cal. Penal Code § 192(a)) with the personal use of a firearm (Cal. Penal Code §

21  12022.5(a)(1)).  (Answer at 2).  Petitioner was sentenced to 21 years in state prison.  (Id.)

22      Petitioner appealed his conviction to the California Court of Appeal.  On June 4, 2002, the

23  court affirmed the judgment.  (Answer at 2; Lod. Docs., Vol. 1, Exs. 2-4).

24      On July 1, 2002, Petitioner filed a petition for review in the California Supreme Court.  On

25  August 14, 2002, the court denied the petition.  (Answer at 2; Lod. Docs., Vol. 1, Exs. 5-6).

26      On October 10, 2003, Petitioner filed a petition for writ of habeas corpus in the Fresno

27  County Superior Court.  On November 3, 2003, the court denied the petition in a reasoned opinion.

28  (Lod. Docs., Vol. 1, Exs. 7-8.)

1    On January 5, 2004, Petitioner filed a petition for writ of habeas corpus in the California

2    Court of Appeal.  On February 20, 2004, the court denied the petition in a reasoned opinion.  (Lod.

3    Docs., Vol. 1, Exs. 9-10.)

4    On April 30, 2004, Petitioner filed a petition for writ of habeas corpus in the California

5    Supreme Court.  On April 13, 2005, the court denied the petition without comment.  (Lod. Docs.,

6    Vol. 1, Exs. 11-12.)

7    On May 3, 2005, Petitioner filed the instant petition in this Court.  The petition raised the

8    following four grounds for relief: 1) Petitioner's rights were violated by juror misconduct; 2)

9    ineffective assistance when counsel failed to i) request that the jury be instructed with CALJIC 2.40;

10    ii) move for a new trial based on juror misconduct; iii) object to Petitioner being shackled in front of

11    the jury; and iv) call witnesses to establish Petitioner suffered significant injuries during his struggle

12    with the victim; 3) violation of due process and right to a fair trial when Petitioner was shackled in

13    view of the jury; and 4) Petitioner's rights were violated when trial court failed to give jury

14    instruction stating that good character alone can constitute a defense.[1]

15    On December 16, 2005, Respondent filed an answer to the petition.

16    On March 20, 2006, Petitioner filed a traverse to the answer.

17    On May 31, 2006, Respondent moved for leave to file a motion to dismiss.  On July 7, 2006,

18    the Court granted the motion for leave, construing it as a motion to supplement the answer.

19    On August 8, 2006, Petitioner filed a supplemental traverse.

20    On July 14, 2008, the Court ordered an evidentiary hearing to receive evidence on the issue

21    of whether the jurors considered extrinsic evidence in reaching their verdict.  The evidentiary hearing

22    was held on April 28, 2009 and the Court ordered Petitioner and Respondent to submit additional

23    briefing, which the parties submitted on July 23, 2009, and November 23, 2009, respectively.

24                                            **FACTUAL BACKGROUND**[2]

25    _____

26    [1]Petitioner has subsequently withdrawn ground four and subgrounds three and four contained within ground two. (Traverse at 8-9 & n.7-8.)

27

28    [2] The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of June 4, 2002 and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1); Lod. Docs., Vol. 1, Ex. 4.  Pursuant to the Antiterrorism and Effective Death Penalty Act of 1996, a determination of fact by the state court is presumed to be correct unless Petitioner rebuts that presumption with clear and convincing evidence.  28 U.S.C. § 2254(e)(1); *see Davis v. Woodford*, 384 F.3d 628,

1    ***Prosecution evidence***

2

3           As of February 2000, Ralph and Nancy Gawor had been married for 13 years.
     In spring of 1999, problems developed in the marriage.  In October of that year,
     Nancy met Petitioner, a police officer and minister, when he performed a wedding
4    ceremony.  This meeting progressed into an affair.  From the beginning, Nancy told
     Petitioner that she was only interested in sex and had no intention of leaving her
5    husband.  Because both had so much to lose, she also insisted on being discreet and
     never going to her home or anywhere Ralph might find them.  Petitioner agreed.  He
6    said he also was having trouble in his marriage, but wanted to stick it out.  At some
     point, Petitioner told Nancy that he had seen a doctor and been prescribed anti-
7    depressants because he was emotional. His emotional level alarmed her at times, and
     at one point she asked him not to telephone her so frequently at work.

8           The Gawor marriage began to improve around December 1999.  Nancy
     informed Petitioner of this and said the two of them needed to "kind of cool things."
9    Petitioner did not seem to take the news well and would telephone her several times a
     day.  She was trying carefully to back out of the relationship so as not to hurt him.
10
            February 11, 2000, was the date of the last sexual liaison between Nancy and
11   Petitioner.  The Gawors spent a romantic evening on Valentine's Day, and the next
     day (Petitioner's birthday), Nancy told Petitioner about it.  He did not have much of a
12   reaction.  When they met later, however, his driving was erratic and he was upset
     because she had been late, worrying him, and also because he had been alone on his
13   birthday.

14          Nancy and Petitioner met for lunch the next day, February 16.  Petitioner
     seemed "kind of okay," but emotional.  He said that the day before had been the worst
15   day of his life.  Nancy said they needed to cool things, but Petitioner grew teary and
     asked her not to do it that week.  They met again the next day after Petitioner had had
16   a board meeting.  Petitioner related that someone at the board meeting had been
     teasing him, and that he had taken out his gun and placed it on the table and jokingly
17   told the person that he shouldn't threaten an armed man.  Petitioner's mood was light
     and jovial.

18          Nancy had a four-day weekend starting Friday, February 18.  There were plans
     for her to go to the Gawor cabin in Shaver.  Petitioner knew this and wanted to know
19   whether Ralph would be with her.  Petitioner jokingly suggested he could visit her at
     the cabin, but ultimately said he would like to telephone her there if Ralph would not
20   be present.  As it turned out, Ralph, who was employed by Haron Jaguar, had to work
     that Saturday, as usual.  He planned to join Nancy at the cabin after he left work on
21   Saturday.  Nancy let Petitioner know that Ralph would not be at the cabin on Friday.

22          During this time, Petitioner was assigned to the Neighborhood Police Officer
     (NPO) unit, which worked out of an apartment on Amber Way, in the Griffith and
23   Blackstone area.  The dressing station (also called the northeast station) which
     serviced those officers was located at Bulldog and Fourth Streets.  Sergeant Kiehn,
24   Petitioner's supervisor, had a policy of wanting at least two people on any
     surveillance.  An officer performing surveillance would not be in uniform.

25          Sometime before noon on Friday, February 18, a regularly-scheduled day off
     for Petitioner (who was assigned to maintain the work schedules for the Amber Way
26   officers), Petitioner asked Kiehn for, and received, permission to perform a solo
     surveillance on a business that had been burglarized several times.  Petitioner

27   _____

28   638 (9th Cir. 2004); *see also Sanders v. Lamarque*, 357 F.3d 943, 948 (9th Cir. 2004).  Here, Petitioner has not presented
     evidence that would permit the Court to set aside the presumption of correctness that has attached to the State court's factual
     findings.

indicated that his partner, Andre Benson, was not going to be with him. Petitioner said nothing about doing surveillance on a confidential informant named John.

Crowd control at California State University, Fresno, fraternity parties was primarily handled by officers from the Eldorado Park NPO, not the Amber Way officers. On the evening of February 18, Petitioner left his home around 5 p.m., wearing his uniform. His son was informed that he was going to a fraternity party for crowd control.

Ralph telephoned Nancy at the cabin around 6:20 p.m. on Friday. He said he was at home and was just going to relax that evening. At 7:20 p.m., Petitioner logged on duty for himself and Officer Benson and informed dispatch that they would be doing surveillance in the Amber Way area. However, Benson did not report for duty on any of his days off that week, and he had not discussed anything with Petitioner, which might have led Petitioner to believe Benson was coming in on Friday to do surveillance. Benson was unaware of any need to conduct surveillance on the business that had been burglarized, nor did he know of any plans to conduct surveillance on John. Benson knew Petitioner was having an affair, as did other officers; Petitioner appeared to be proud of the fact.

Petitioner telephoned Nancy at the cabin at 7:24 p.m. They talked for just over half an hour. He told her that he was working an extra job that night at Bulldog Brewery. Later, he asked to come up to the cabin, but she refused because she was afraid they would be seen. Nancy attempted to end the conversation several times, but Petitioner seemed to ignore her until he had to go to work.

Officer Corneilson saw Petitioner at the northeast dressing station between 9:20 and 9:45 p.m. Petitioner appeared to have been sweating. Petitioner said he had been out on surveillance with the other NPO officers. He said nothing about having been involved in a disturbance or having to use his baton and Corneilson observed no injuries to his face, head, or hands. Petitioner seemed "distant." Petitioner logged off for himself and Benson at 9:53 p.m.

Petitioner returned home around 10:00 p.m. His son was informed that he had had to hit someone on the head with his baton, and that there would probably be an investigation. Petitioner said all eight of the NPO officers had had to work the party. The next day, Petitioner and his family went to play laser tag. Petitioner's son did not notice anything unusual about Petitioner then or during the following week.

Around 10:00 a.m. on Saturday, February 19, Ralph Gawor's lifeless body was discovered in the living room of his home near Sierra and Valentine Avenues in Fresno. There were no signs of forced entry or obvious indications of a struggle. All of the doors and windows were locked. The manual override had been activated on one of the garage door openers, allowing the door to be opened or closed without activating the motor of the garage door opener.

Nancy Gawor was notified of her husband's death on Saturday. When she initially was interviewed by Detectives Murrietta and Martin, she denied having a boyfriend because she did not believe there was any connection to Ralph's death and she was concerned about her and Petitioner's reputations. Nancy had to work on Sunday and cleared her voice mail messages at that time. Several were from Petitioner. In the first, he said he was calling to say hi, knew she was at the cabin, and would talk to her on Tuesday. In the next one, which was recorded on Sunday, he said he had read about Ralph in the newspaper and was sorry. He said he could not imagine what she must be going through, but that if she needed anything, she could call him. She subsequently received another voice mail message from Petitioner in which he asked her to call him when she could. He said he did not know what Nancy might be thinking, but that while he might be crazy, he was not that kind of crazy and did not kill anyone or know anything about it.

Petitioner returned to work the following Tuesday. He said something to

Benson about having worked Friday. On Tuesday, the two officers attended a party for one of the children in the Amber Way neighborhood. Benson did not notice any change in Petitioner's demeanor, although Petitioner kept to himself in the office. When Benson asked if he was all right, Petitioner said he had broken it off with all the other ladies and was going to go to a different area and start fresh, as he had recently been approved for a position in southeast Fresno. At some point during the week following the homicide, Petitioner asked Benson what Benson thought of how he was living his life. Benson replied that sometimes someone strays from the Lord, but He has a way of bringing that person back. Petitioner said something about the Lord slapping him real hard to bring him back.

The Wednesday following Ralph's death, Nancy telephoned Petitioner at his work. She mentioned that the police had no motive, as nothing was stolen and it did not make sense that someone would want to kill Ralph. Petitioner said he knew who might be the most obvious, but that he had been logged on and with people all day that day, except during the time he telephoned her. Nancy admitted having thought Petitioner might be involved, but dismissed the notion because he was a police officer and pastor. She informed him that she had not told the police about their relationship. Petitioner said he was worried that his wife (Sylvia) would find out, but if Nancy had to say something, he would understand. At some point during the conversation, Petitioner said he had thought about Nancy now being free, as if now there would be an opportunity, but things were working out well between him and Sylvia.

On or about February 25, Nancy revealed the affair to detectives. Detectives Murrietta and Martin interviewed Petitioner on February 26. The interview was video- and audiotaped, and the videotape was shown to the jury. During this interview, Petitioner admitted having an affair with Nancy, but denied killing Ralph. Petitioner related that "we" logged on and worked Friday evening, doing some surveillance. He subsequently stated that he logged Benson on, but then Benson did not show up. Petitioner explained that he was working to make up hours beforehand so that he could take Sunday and Monday off. Petitioner commented that he thought Ralph was killed with a knife. He claimed several times to have attended the 9:00 p.m. briefing at the northeast station.

Petitioner was not arrested at that point. After the interview, however, Murrietta and Martin seized certain items, including Petitioner's gun belt and attached equipment, from the NPO office. The Fresno Police Department issues a gun and three magazines, one of which goes in the gun and the extra two in a magazine pouch on the officer's utility belt. Each contains 11 rounds, and standard practice is to have one round in the chamber, for a total of 34 rounds. Petitioner had Black Talon (black-tip hollow point) ammunition, which was the Fresno Police Department's duty ammunition and which was not generally available to the public. The Fresno Police Department does not tolerate alteration of an officer's duty weapon or the use of non-duty-issued ammunition. When an officer shoots at the range, he or she uses ammunition designated for use only at the range, and not his or her duty ammunition.

While Murrietta and Martin were at the NPO office, Detective Schiotis and other officers were searching Petitioner's house with Petitioner's consent. Their primary interest was Petitioner's .40-caliber Beretta duty weapon, which was the police department's standard issue. With the assistance of Petitioner's son, the weapon was found in a fanny pack in the master bedroom. It was fully loaded. The fanny pack also contained, among other items, a magazine loaded with nine-millimeter rounds, handcuffs, and one plastic latex-type glove. Schiotis also located a nine-millimeter semi-automatic pistol in the computer cabinet. It is not unusual for an officer to have both a duty-issued weapon and a backup weapon that is approved by the department.

While Schiotis was searching Petitioner's house, he found a sack in a closet. According to Petitioner's son, upon looking into the sack, Schiotis said there was

nothing inside.  Defense counsel subsequently came to the house and checked the sack.  It contained nine bullets.  According to Schiotis, defense counsel informed detectives that the bag might contain evidence.  When Schiotis then seized the bag, it contained 10 live rounds.  One was a hollow point, while the other nine were truncated rounds.  All had marks consistent with their having been circulated through a magazine and all were range bullets.

The two bullets recovered in connection with the shooting matched Hurth's weapon, which would have ejected cartridge casings when fired.  The damaged bullet was a round-nose bullet with a full metal jacket.  The intact bullet was also a full metal jacket, but it had a truncated cone.  Upon learning of the match on the evening of February 26, Schiotis arrested Petitioner at his home.

### Defense evidence

Petitioner testified on his own behalf.  He admitted lying in the videotaped interview; he did so not to cover up the homicide, but to protect his family from the humiliation they would suffer if it became known that he-a minister and pastor of a church-had had an affair.  He believed the homicide was justified because he was defending himself.

Petitioner was originally a missionary, minister, and law enforcement chaplain.  He resigned from the church at which he was pastor to attend the police academy, and was hired as a police officer by the City of Fresno on December 16, 1996.

Petitioner's initial meeting with Nancy Gawor was a very brief one, at a funeral.  On October 1, 1999, he performed a wedding at Wolf Lakes.  She attended, and that was the start of their relationship.  Theirs was a sexual relationship; they were not in love.  Petitioner had never had an affair before, and felt he began it in part because of the kind of police officers he was around, with their macho and bravado.

Petitioner began having emotional problems with the affair about a week later, after his and Nancy's first sexual encounter.  Despite this fact, the affair continued because he was unable to break it off.  He eventually saw his family doctor, who first prescribed something for his stomach and then, because Petitioner was becoming emotionally distraught, concluded he was clinically depressed.  The doctor recommended that Petitioner see someone for depression, and Petitioner was placed on medication which was a great help.  Petitioner last saw his doctor a little more than a week before the shooting.  Petitioner was feeling much better.

The affair began winding down, as Petitioner and Nancy were both trying to stop it.  Nevertheless, they met on Friday night, February 11, and again on the morning of February 12.  That was their last sexual contact, although they saw each other once or twice more before the night of the shooting.  During this time, Petitioner was not in a depressed or obsessive state.

Petitioner and Nancy had a telephone conversation on Thursday about her weekend plans.  She explained that she had a four-day weekend and would be going to the cabin.  She did not think Ralph was going to go, but was not sure.  On Friday, Nancy left Petitioner a voice mail in which she said she would be going to the cabin and Ralph was not going to go.  She told Petitioner to call her at the cabin.

Petitioner had been thinking for a day or two that if he told Ralph, the affair would have to stop.  He knew Nancy would be angry with him, but he felt, from what she had explained about Ralph, that he was easy-going and not overly excitable. Petitioner believed he could talk to Ralph, so he decided he would take care of personal business and then go to work, in order to get in the hours he needed to take Sunday off.  Petitioner believed this course of action would be all right because, even though he knew about Ralph's guns, everything he had heard was that Ralph was low key and easy-going.

Petitioner spent the day with his family, then, after dinner, told his wife he needed to go to work for a couple of hours.  He told her that he was going to be working at the fraternity.  By this time, Petitioner had already talked to Sergeant Kiehn about doing surveillance.  Petitioner did intend to check out the burglarized business and John, the confidential informant, but he was going to take care of his personal business-seeing Ralph-first.

Petitioner put on part of his uniform at home, then finished dressing at the NPO office.  He had his gun and his expandable baton.  There were other items on his utility belt as well, including pepper spray.  After he finished dressing, he logged on for himself and Officer Benson.  He included Benson mainly because he had told his wife he would be working with other people, and if she telephoned dispatch, Benson would be shown as working with him.  In reality, Petitioner had never talked to Benson about working that night and had told Kiehn he would be working alone.  Petitioner denied devising an alibi for himself; however, he admitted setting up lies to cover himself with different people in order to make time to take care of his personal business with Ralph.

After Petitioner logged on, he telephoned Nancy at the cabin.  They talked for awhile, and she said that not many neighbors were there and she was thinking about having him come up and spend the night with her.  Thinking the affair had to end because of what he was doing to his wife and children, Petitioner made up the excuse that he had to work at the Bulldog Brewery.  The telephone call helped Petitioner resolve to speak to Ralph in order to end the affair.

Petitioner went to Ralph's house in uniform because he felt the uniform would get him "in the door."  Also, people tend to respect the uniform, and sometimes its presence defuses a situation.  For transportation, he used an unmarked van from the northeast station, but did not log the vehicle out.  Once at the Gawor house, Petitioner intended to apologize, ask forgiveness, and end the affair.

When Ralph answered the door, Petitioner introduced himself and said he wanted to talk to Ralph about his wife, Nancy.  Ralph let him in.  As Petitioner entered, he saw a gym bag in the hallway, but did not know what was in it.  Ralph took Petitioner into the family room area, and Petitioner asked if they could sit down.  Ralph moved some things from the couch, then asked if Nancy was all right.  Petitioner told him she was fine.  Ralph pressed Petitioner as to the purpose of the visit, and Petitioner told him that he and Nancy had been having an affair.  Petitioner had received a lot of training in giving bad news, and that training had taught him to be compassionate, but direct.

Ralph and Petitioner were still standing.  Ralph turned red, called Petitioner a son of a bitch, and pushed him with both hands to the chest.  Petitioner nearly fell.  Ralph struck Petitioner in the chest with a closed fist, but it did not hurt as Petitioner was wearing his body armor.  Ralph then shoved Petitioner, who had not expected this type of reaction, into the sliding glass door.  Petitioner was "a little stunned" at that point, and did not do anything to bring the situation under control.  He was not in a "police" frame of mind.

Petitioner thought Ralph was trying to kill him, as he believed Ralph had tried to throw him through the glass.  Petitioner was thinking that he had to get out of there.  He had not been in many fights, but when Ralph came at him again, Petitioner grabbed his right wrist and twisted, turning Ralph so that Ralph was facing the glass door and Petitioner was behind him.  Ralph was very strong and powerful, and hard to control.

Still thinking he had to get out of there, Petitioner tried to apply the carotid restraint he had been taught at the academy.  He wanted to render Ralph unconscious but, as he tried to guide Ralph to the ground so he would not be hurt as he lost consciousness, Ralph drove with his legs and pushed Petitioner into the back of the

couch. Petitioner was scared, and he was unsuccessful in getting Ralph to "go to sleep" so he could get out of there.

The couch was knocked over, and Ralph and Petitioner ended up on the floor, struggling. Petitioner was still trying to apply the carotid hold, even at one point imploring Ralph, "[W]ill you just go to sleep?" Petitioner ended up with rug burns as well as bruises that lasted more than a week, but did not show or tell anyone, even though the bruise on his arm was still visible when he was being booked for murder. Ralph pushed Petitioner off, then came at him and they wrestled around. Petitioner pulled his expandable baton from his utility belt and struck Ralph in the head, trying to knock him out. During the fight, a Band-Aid came off Petitioner's thumb. Petitioner hit Ralph several times, but was never able to deliver a good strike. Ralph knocked the baton from Petitioner's hand.

When Petitioner rose, Ralph, who was on the ground, grabbed Petitioner's testicles. Petitioner thought Ralph was trying to castrate him. Petitioner, who thought Ralph was trying to kill him, pushed Ralph off. He saw Ralph grab for a weapon. Petitioner could not tell what it was, but he saw something in Ralph's right hand. Petitioner, who was standing at about Ralph's feet, drew his duty weapon, thinking he could ward Ralph off with it. When Petitioner drew his weapon, his police training kicked in. Ralph started raising up with something in his hand. He said to Petitioner, "I am going to kill you, you bastard." Ralph was rising but still basically on the floor, and he was coming up with the baton in his hand. Petitioner fired twice in what is called a "double tap"-two quick shots to the body. When he pulled the trigger, he felt he had no choice because he was going to die. He intended to stop Ralph; there was no way but to kill him. Ralph went back down and his eyes glazed over. Petitioner believed he was dead.

Petitioner thought about calling 911, but put down the telephone because he was not supposed to be there. His thoughts were jumbled, and he was crying and sweating profusely. He picked up the telephone again to call his dispatcher. He dialed the first digit, but then was unsure whether he needed an ambulance or a coroner. He put on gloves, which he carried in his vest, and checked to see if Ralph was dead. When he felt for a heartbeat, a splotch of blood came up on Ralph's shirt and Petitioner "lost it."

The room was torn up, and Petitioner thought he had to clean up Nancy's house. Afraid that Ralph would bleed all over the rug, Petitioner took a piece of extra carpeting that was being used as a doormat and put Ralph on it. Petitioner rolled Ralph onto his side, but thought he appeared uncomfortable and so repositioned him. Petitioner then began to clean up the room. He righted furniture and threw away a broken rabbit figurine. Petitioner also tried to reposition the couch where it had been, and believed the handprint in the dust on the couch was probably his. As he was doing all this, on one level he knew he had shot Ralph, but it did not seem real. All he was thinking about was cleaning up. He wanted to put things back the way they were. As part of his housekeeping, he picked up his expended shell casings, which he put in his pocket.

This all took about 15 minutes. As Petitioner finished, he thought he had better lock up the house so the house would not be burglarize. He discovered that the front door had a deadbolt that required a key to lock it from the outside. He turned off the porch light to save energy, then went back through the kitchen, turning off two more lights as he went. He thought he had taken off his gloves by this point. He entered the garage and electronically raised the door, then tried to run out as the door was closing. However, he tripped a safety beam and the door raised back up. Petitioner did this three or four times, then pulled the cord on the garage door mechanism so he could manually operate the door. He then left and closed the door behind him.

Petitioner drove off in the van, still sweating and crying. He returned to the

NPO office about 10 to 15 minutes after he left the Gawor residence. He walked into the office, which smelled terrible, and threw away his gloves. He washed his face, trying to regain his composure. He kept thinking that this did not happen and it was not real. He then took the trash and emptied it in the designated Dumpster across the street, because it smelled so bad. He took his gun and his keys from his utility belt and started to drive to the northeast station. He did not see any of the NPO officers during this time. As he was driving, he realized the shell casings were still in his pocket and he threw them out the window near Fashion Fair. He was unsure why he did this, except that the shells were in his pocket and did not belong there. He did not throw them away because they were evidence, but because they reminded him of the shooting.

Petitioner arrived at the northeast station as a briefing was ending. He transferred items from the van to his personal vehicle, then went inside and delivered NPO paperwork to the secretary's office. He spoke to a couple of officers, telling one he was sweating because he had been in the van, doing surveillance. He then went into the sergeant's office and telephoned his wife. When she asked what was wrong, he told her that he had to hit someone with his baton at the fraternity and was finishing his reports and would then be home. He then sat in the office in the dark, praying. He subsequently logged off for himself and Benson.

Petitioner arrived home a little after 10:00 p.m., told his wife some more lies, showered, and took two sleeping pills. He was able to sleep a little that night, but not much. The next day, which was a day off for him, he did some things around the house. He attempted to write a sermon he was to give on Sunday, but ended up having to use previously prepared material because he could not concentrate. The events of the night before still felt unreal. That afternoon, Petitioner cleaned both of his guns and realized that he had never removed the range ammunition from his duty weapon after the last time he was at the range, which was January 14. On that day, he had shot poorly (albeit accurately enough to pass) and so he was going to shoot again, using his backup weapon. However, the Northwest POP team came through and wanted to qualify as a team, so Petitioner did not shoot anymore, as he was told to come back later. When he was reloading, he got involved in a conversation and was not paying attention, which he believed was how the range ammunition ended up in his gun. When he cleaned his gun at home, he put the shells from the magazine in a bag he had in the closet and reloaded his weapon with duty ammunition. He tried to keep his activities that day as normal as possible and be with his family.

On Sunday, Petitioner attended church and gave a sermon. He felt like "[t]he ultimate hypocrite" because he had had an affair. He believed the shooting had been self-defense, but knew the affair would soon be exposed. After church, he and his family had fun, playing laser tag. They also went and looked at some model homes, which was an activity Petitioner and his wife enjoyed. Later that evening, Petitioner telephoned Nancy Gawor's voice mail, said he had read about Ralph's death, and offered condolences. He did not want Nancy to know he had killed her husband. On Monday, which was also a day off for Petitioner, he and his family met his in-laws in Modesto and played miniature golf. This was Petitioner's idea, as he wanted his family around him.

Tuesday, February 22, was a workday for Petitioner. As usual, he held a men's Bible study that morning, but inside he was "a wreck" and feeling like he was a "big hypocrite." He went through a normal workday and attended a birthday party for a neighborhood child that afternoon with Benson. Petitioner also worked Wednesday, during which time he received a telephone call from Nancy in which she indicated she was going to tell the police about the affair. Petitioner told her to go ahead, that he had nothing to hide. In reality, he was still hoping the affair would not come to light because of the shame and dishonor.

Petitioner worked Thursday, then Friday was a day off. That was the day he

was interviewed by detectives.  It was still very important that the affair not come out if at all possible, but the detectives told him that if nothing came of the investigation, the story of the affair would go no farther.  Petitioner lied in the interview about the homicide.  He gave the names of people he claimed could verify his whereabouts for the time period of the homicide.  He did this to mislead detectives. For the same reason, he also stated that he had wondered if Nancy would hire someone to kill Ralph, or whether Ralph was having an affair.

Petitioner claimed he was telling the truth at trial when he said he believed his life was in danger when he fired the fatal shots.  He did not go to Ralph's house with the intent to kill Ralph, and he tried to talk at first.  When that did not work, he tried to use different levels of force.  He did not kill with any pre-planning, but because he felt he had to.  He felt tremendous remorse for Ralph and the Gawor family.  Petitioner always felt the shooting was justified; however, he did not tell any of the proper authorities that this was a justifiable homicide until he was identified as the killer.

## DISCUSSION

### I.    Jurisdiction

A person in custody pursuant to the judgment of a state court may petition a district court for relief by way of a writ of habeas corpus if the custody is in violation of the Constitution, laws, or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); *Williams v. Taylor*, 529 U.S. 362, 375 n.7 (2000).  Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution.  As Petitioner is currently incarcerated in Mule Creek State Prison, located in Amador County,  and  Petitioner's custody arose from a conviction in the Fresno County Superior Court, the Court has jurisdiction over Petitioner's application for writ of habeas corpus.  *See* 28 U.S.C. § 2241(d) (vesting concurrent jurisdiction over application for writ of habeas corpus to the district court where the petitioner is currently in custody or the district court in which a State court convicted and sentenced Petitioner if the State "contains two or more Federal judicial districts"); *see also* 28 U.S.C. § 84(b) (stating that Amador and Fresno County falls within the territorial jurisdiction of the Eastern District of California).

### II.    ADEPA Standard of Review

On April 24, 1996, Congress enacted the Anti-terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for a writ of habeas corpus filed after the statute's enactment.  *Lindh v. Murphy*, 521 U.S. 320, 326-327 (1997); *Jeffries v. Wood*, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied*, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting *Drinkard v. Johnson*, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied*, 520 U.S. 1107 (1997), *overruled on other grounds by Lindh*, 521 U.S. 320 (holding AEDPA only applicable to cases filed after statute's enactment)).  The

1    instant petition was filed in 2005 and is consequently governed by the provisions of the AEDPA,

2    which became effective April 24, 1996.  *Lockyer v. Andrade*, 538 U.S. 63, 70 (2003).  Thus, the

3    petition "may be granted only if [Petitioner] demonstrates that the state court decision denying relief

4    was 'contrary to, or involved an unreasonable application of, clearly established Federal law, as

5    determined by the Supreme Court of the United States.'"  *Irons v. Carey*, 505 F.3d 846, 850 (9th Cir.

6    2007) (quoting 28 U.S.C. § 2254(d)(1)); *see Lockyer*, 538 U.S. at 70-71.

7         As Petitioner is in custody of the California Department of Corrections and Rehabilitation

8    pursuant to a state court judgment, 28 U.S.C. § 2254 remains the exclusive vehicle for Petitioner's

9    habeas petition.  *Sass v. California Board of Prison Terms*, 461 F.3d 1123, 1126-1127 (9th Cir.

10   2006) (quoting *White v. Lambert*, 370 F.3d 1002, 1006 (9th Cir. 2004) in holding that, "[s]ection

11   2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state

12   court judgment, even when the petitioner is not challenging his underlying state court conviction'").

13        As a threshold matter, this Court must "first decide what constitutes 'clearly established

14   Federal law, as determined by the Supreme Court of the United States.'"  *Lockyer*, 538 U.S. at 71

15   (quoting 28 U.S.C. § 2254(d)(1)).  In ascertaining what is "clearly established Federal law," this

16   Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of

17   the time of the relevant state-court decision."  *Id*. (quoting *Williams*, 592 U.S. at 412).  "In other

18   words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or

19   principles set forth by the Supreme Court at the time the state court renders its decision."  *Id*.

20   Finally, this Court must consider whether the state court's decision was "contrary to, or involved an

21   unreasonable application of, clearly established Federal law."  *Lockyer*, 538 U.S. at 72, (quoting 28

22   U.S.C. § 2254(d)(1)).  "Under the 'contrary to' clause, a federal habeas court may grant the writ if

23   the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question

24   of law or if the state court decides a case differently than [the] Court has on a set of materially

25   indistinguishable facts."  *Williams*, 529 U.S. at 413; *see also Lockyer*, 538 U.S. at 72. "Under the

26   'unreasonable application clause,' a federal habeas court may grant the writ if the state court

27   identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies

28   that principle to the facts of the prisoner's case."  *Williams*, 529 U.S. at 413.  "[A] federal court may

1   not issue the writ simply because the court concludes in its independent judgment that the relevant

2   state court decision applied clearly established federal law erroneously or incorrectly. Rather, that

3   application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable

4   application" inquiry should ask whether the State court's application of clearly established federal

5   law was "objectively unreasonable." *Id*. at 409.

6         Petitioner bears the burden of establishing that the state court's decision is contrary to or

7   involved an unreasonable application of United States Supreme Court precedent.  *Baylor v. Estelle*,

8   94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth

9   Circuit precedent remains relevant persuasive authority in determining whether a state court decision

10  is objectively unreasonable.  *See Clark v. Murphy*, 331 F.3d 1062, 1069 (9th Cir. 2003); *Duhaime v.*

11  *Ducharme*, 200 F.3d 597, 600-01 (9th Cir. 1999).  Furthermore, AEDPA requires that we give

12  considerable deference to state court decisions.  The state court's factual findings are presumed

13  correct and a federal habeas court is bound by the state court's interpretation of state law. 28 U.S.C.

14  § 2254(e)(1); *Souch v. Schaivo*, 289 F.3d 616, 621 (9th Cir. 2002).

15  **III.      Review of Petitioner's Claims**

16          *A.      Ground One: Jury Misconduct*

17        Petitioner argues that his rights to a fair trial, an unbiased jury, and to confront and cross-

18  examine witnesses were violated based on certain instances of juror misconduct.  Petitioner claims

19  that the misconduct consisted of the foreman attempting to convince other jurors to reach a verdict so

20  the jurors could return to their jobs, certain jurors conducting deliberations outside the jury room, the

21  jury's consideration of items not in evidence such as newspapers and extraneous definitions, and the

22  jury viewing Petitioner in restraints.

23        These claims were presented in a petition for writ of habeas corpus to the Fresno County

24  Superior Court, which denied the petition in a reasoned opinion on November 3, 2003.  (Lod. Docs.,

25  Vol. 1, Exs. 7-8.)  The issues were then raised in a petition for writ of habeas corpus to the California

26  Court of Appeal, which denied the petition in a reasoned opinion on February 20, 2004.  (Lod. Docs.,

27  Vol. 1, Exs. 9-10.)  The issues were then raised in a petition for writ of habeas corpus to the

28  California Supreme Court, which summarily denied the petition on April 13, 2005.  (Lod. Docs.,

1  Vol. 1, Exs. 11-12.)  The California Supreme Court, by its "silent order" denying the petition, is

2  presumed to have denied the claims presented for the same reasons stated in the opinion of the lower

3  court.  *Ylst v. Nunnemaker*, 501 U.S. 797, 803 (1991).

4          In rejecting Petitioner's claims, the Court of Appeal found that, for the most part, Petitioner

5  had failed to establish juror misconduct.  The appellate court further found that to the extent

6  misconduct had been shown, Petitioner had failed to demonstrate that there was a substantial

7  likelihood that any juror was biased against him or that any extraneous material was likely to have

8  influenced a juror.  (Lod. Docs., Vol. 1, Ex. 10 at 1.)

9          Juror misconducts results from the introduction of extraneous materials into deliberations,

10  namely material that was not in evidence or in the instructions.  *See Thompson v. Borg*, 74 F.3d

11  1571, 1574 (9th Cir. 1996); *see also Turner v. Louisiana*, 379 U.S. 466, 472-473 (1965)).  However,

12  habeas relief is only available for a juror misconduct claim where the alleged error had a substantial

13  and injurious effect on the verdict.  *Mancuso v. Olivarez*, 292 F.3d 939, 949 (9th Cir. 2002).

14          ***1.      Deliberating outside jury room and foreman's attempt to persuade jurors to***

15                  ***quickly reach a verdict***

16          Petitioner argues that deliberations improperly took place outside of the jury room and that

17  the jury foreman improperly attempted to convince other jurors to quickly reach a verdict so the

18  jurors could return to their jobs.  The Court finds that the state court's determination as to this issue

19  was not unreasonable.  In support of his claim, Petitioner points to the following conversation as

20  recounted by Juror Herzog in his juror interview.

21          Q:  Another incident?

22          A:  Uh, we were walking to the cars, myself and Mark, another juror when the
            foreman approached us and tried to convince us to give in to the other half so we can
23          go back to our jobs.

24          Q:  And he did this out of the presence of the other jurors?

25          A:  Correct.

26          Q:  And when you say that he......you were in the parking lot, parking garage?

27          A:  Sidewalk.

28          Q:  Sidewalk?

1       A:  Walking to the parking lot where we parked our cars.

2       Q:  And it was the jury foreman that did this?

3       A:  Yes it was.

4       Q:  And what was his approach?

5       A:  I don't remember exactly the conversation, how it even started.  We were walking
        on the sidewalk and if I recall, we were talking about how many days we had been in
6       deliberation and uh, I don't recall talking about the actual case, I really don't.  But I
        do recall, knowing that myself and this other juror, Mike, were one of the ones that
7       were willing to stick around because that was what needed to happen.  So he
        confronted us about it and said something to the point to where you know, 'Hey,
8       we've to to get back to our jobs.'  He works for the Bee or something like that and he
        needs to get back.  Well, to me, I wasn't getting paid anyways so seven days to
9       twenty-three days didn't matter to me.  So to me that was jury misconduct and it
        was....it wasn't a right statement.

10
        Q:  So you are saying he did talk about the case because obviously he was talking to
11      you about which way to sway your vote if you will?

12      A: Yes.

13  (Exhibits in Support of Petition, Interview of Herzog at 6-7).  Petitioner has failed to show, however,

14  that this conversation substantially and injuriously affected the verdict, as Juror Herzog

15  acknowledges that there were no discussions about the merits of the case outside the presence of the

16  other jurors and there is no evidence that the foreman's request to reach a quick conclusion was

17  significantly discussed or considered by the jury in reaching a verdict.

18              *2.       Consideration of newspapers*

19      Petitioner argues that, during the trial, certain jurors improperly viewed newspapers which

20  had articles covering Petitioner's case.

21      The state court's determination as to this issue was not unreasonable.  Juror Herzog stated

22  that he recalled a newspaper being present in the jury room in the following answer:

23          I remember one day.....I want to say it was actually during the beginning of the case,
            maybe the first day or two.  There was a newspaper that was brought in, Fresno Bee.
24          I do not remember who that was, but I know that got thrown out in a hurry.
            Somebody just spoke up and said you can't have that.  I don't know how far he got
25          into reading it.  I don't even know if he opened the article.  I just know that it was in
            there one day for a very small short period of time.  That's what I remember.

26
    (Exhibits in Support of Petition, Interview of Herzog at 7).
27
    \\\
28

1    Juror Benzler also stated that Juror Bauer would bring in a newspaper almost every day, although

2    Bauer denied reading anything about the trial, and that some of the male jurors would look at the

3    sports pages.  (Exhibits in Support of Petition, Interview of Benzler at 4-5.)  These facts are

4    insufficient to find that the jury's verdict was substantially and injuriously affected by the presence

5    of the newspapers, as there is no evidence that any juror obtained extraneous information by reading

6    the articles covering Petitioner's case.

7                         *3.      Consideration of extraneous definitions*

8              Petitioner argues that the jury improperly considered definitions for voluntary and

9    involuntary manslaughter that were obtained from outside sources rather than using the definitions

10   provided by the trial court.  The Sixth Amendment right to a jury trial mandates that the verdict

11   reached by that jury be based upon evidence produced at trial.  *Estrada v. Scribner*, 512 F.3d 122

12   (9th Cir. 2008) (citing *Jeffries v. Wood*, 114 F.3d 1484, 1490 (9th Cir. 1997), *overruled on other*

13   *grounds by Lindh v. Murphy*, 521 U.S. 320 (1997)).   Due process requires that the defendant be tried

14   by "a jury capable and willing to decide the case solely on the evidence before it."  *Smith v. Phillips*,

15   455 U.S. 209, 217 (1982).  When the jury breaches this duty by considering extraneous facts not

16   introduced into evidence, "[t]he juror in effect becomes an unsworn witness, not subject to

17   confrontation or cross examination."  *Sassounian v. Roe*, 230 F.3d 1097, 1108 (9th Cir. 2000) (citing

18   *Jeffries*, 114 F.3d at 1490).  In such cases, a defendant has effectively lost the rights of confrontation,

19   cross-examination, and the assistance of counsel with regard to jury consideration of the extraneous

20   evidence.  *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995).  "Evidence not presented at trial ... is

21   deemed 'extrinsic.'"  *United States v. Navarro-Garcia*, 926 F.2d 818, 821 (9th Cir. 1991) (citing

22   *Marino v. Vasquez*, 812 F.2d 499, 504 (9th Cir. 1987)).  Therefore, a jury's use of a dictionary to

23   define a term violates a defendant's constitutional rights.  *See Marino*, 812 F.2d at 505-506.

24             However, jury misconduct, such as considering extrinsic material, is subject to a harmless

25   error analysis.  *Estrada*, 512 F.3d at 1238 (citing *Sassounian*, 230 F.3d at 1108).  The factors a court

26   must consider in determining whether the error is harmless are: (1) whether the extrinsic material

27   was actually received; (2) the length of time the extrinsic material was available to the jury; (3) the

28   extent to which the jurors discussed and considered the extrinsic material; (4) when the material was

1   introduced–whether it was introduced before a verdict was reached, and if so at what point in the

2   deliberations; and (5) any other matters which may bear on the issues of whether the introduction of

3   extrinsic material substantially and injuriously affected the verdict. *See Fields v. Brown*, 503 F.3d

4   755, 779 n. 18 (9th Cir. 2007); *see also Sassounian*, 230 F.3d at 1109; *Mancuso*, 292 F.3d at

5   951-952.

6        The Court conducted an evidentiary hearing on this matter on April 28, 2009, during which

7   four jurors testified as to their recollection of whether extrinsic material, and specifically a dictionary

8   definition, had been introduced during jury deliberations.  The Court first heard from Debra Lyn

9   White, who testifed that "[s]omebody had brought in definitions of voluntary-involuntary."

10  (Evidentiary Hearing Transcript (EHT), at 23).  She testified that this conclusion stemmed from

11  someone reading aloud what she thought was a definition off a piece of paper.  (Id).  On cross and re-

12  cross, Ms. White admitted that she had just assumed that others had looked up the definition and did

13  not know the actual source of the supposed definition.  (Id. at 35, 62).

14       The Court then heard from Catherine Jean Benzler, who testified that she herself looked up

15  the definition of manslaughter from the Webster's Dictionary but noted that it "didn't do anything to

16  help me."[3]  (Id. at 69).  Ms. Benzler never testified that she shared the definition with anyone else;

17  thus, she could not be the person who read the definition aloud as attested to by Ms. White.

18  However, Ms. Benzler did testify that the jurors seem to have more clarity  and that there was "more

19  of enthusiasm of different words thrown in."  (Id. at 70).  Ms Benzler also stated that the words being

20  thrown into the jury's discussion sounded like definitions form a dictionary. (Id. at 75).  However,

21  she also testified that she could not tell what the source of this new found clarity was.  (Id. at 71, 77).

22       The Court next heard from two jurors called by Respondent–Delbert L. Abercrombie and

23  Betty De La Cruz.  Both Mr. Abercrombie and Ms. De La Cruz testified that they did not remember

24  anyone bringing in a definition obtained from a dictionary during jury deliberations.  (Id. at 88, 105).

25  Mr. Abercrombie further stated that had such information been introduced during deliberations, he

26  would have remembered as he would have wondered where the other juror got that information.  (Id.

27

28
       [3]Consequently, the Court does not consider this incident of jury misconduct by Ms. Benzler to be prejudicial as by
   her own admission, she did not consider this material in her decision nor did she share the evidence with another person.

at 89).

The Court finds that Petitioner has failed to meet his burden in establishing that extrinsic material was introduced during jury deliberations. During cross examination the potential bias of Ms. White was brought up as a plausible motivation for her current testimony. Ms. White had testified at Petitioner's sentencing asking that court for lenience. (Id. at 46-48). Ms. White further stated that she did not feel the verdict was appropriate. (Id. at 48, 50). Contrasted with the obvious bias of Ms. White, both Mr. Abercrombie and Ms. De La Cruz presented as credible and objective witnesses. Disregarding Ms. White's bias, the testimony provided by both her and Ms. Benzler did not establish that extrinsic material had been introduced during deliberations. Ms. White testified that she assumed the statement read aloud by a fellow juror was a definition from a dictionary but did not know its actual source. Ms. Benzler likewise did not testify that she knew that the source of the new found clarity was a dictionary definition of the relevant terms. Consequently, even if the Court were to believe the testimony provided by Ms. Benzler and Ms. White, such evidence is insufficient to establish that any jury misconduct resulted and thus cannot provide Petitioner relief on this ground.

_____ **4.**      ***Viewing Petitioner in restraints***

Petitioner argues that the jurors improperly considered the fact that Petitioner was seen in restraints. Habeas corpus relief is only granted if the "chaining had substantial and injurious effect or influence in determining the jury's verdict." *Castillo v. Stainer*, 997 F.2d 669 (9th Cir.1993) (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 637(1993)). The Court finds that the state court's determination as to this issue was not unreasonable. Juror Herzog stated that he did see Petitioner walk into the courtroom in handcuffs and that, "I want to say they undid it when he came in." (Exhibits in Support of Petition, Interview of Herzog at 10.) Juror White similarly stated in her interview that she saw Petitioner in the courtroom with restraints on his hands, adding that "it appeared to me that they just forgot to take them off when he came into the courtroom. Uh, because like I said, he was already sitting down and they just kind of went over and undid them." (Exhibits in Support of Petition, Interview of White at 5.) These statements are insufficient to find that the verdict was substantially and injuriously affected, as the jurors only briefly viewed the restraints on

1   one occasion and there is no evidence that they significantly discussed or considered the issue in

2   reaching a verdict.  (See Exhibits in Support of Petition, Interview of Herzog at 11; Interview of

3   White at 6.)

4        **B.      *Ground Two***

5        Petitioner argues that his counsel was ineffective in failing to request an instruction on good

6   character evidence as a defense and failing to make a motion for new trial based on the previously

7   discussed instances of juror misconduct.

8        These claims were presented in a petition for writ of habeas corpus to the Fresno County

9   Superior Court, which denied the petition in a reasoned opinion on November 3, 2003.  (Lod. Docs.,

10  Vol. 1, Exs. 7-8.)  The issues were then raised in a petition for writ of habeas corpus to the California

11  Court of Appeal, which denied the petition in a reasoned opinion on February 20, 2004.  (Lod. Docs.,

12  Vol. 1, Exs. 9-10.)  The issues were then raised in a petition for writ of habeas corpus to the

13  California Supreme Court, which summarily denied the petition on April 13, 2005.  (Lod. Docs.,

14  Vol. 1, Exs. 11-12.)  The California Supreme Court, by its "silent order" denying the petition, is

15  presumed to have denied the claims presented for the same reasons stated in the opinion of the lower

16  court.  *Ylst v. Nunnemaker*, 501 U.S. at, 803.

17       In rejecting Petitioner's claims, the Court of Appeal found that Petitioner failed to

18  demonstrate deficient performance by counsel or prejudice, referencing its prior opinion denying

19  Petitioner's appeal with respect to his claim that the jury was improperly instructed.  (Lod. Docs.,

20  Vol. 1, Ex. 10 at 2).  In its prior opinion, the court found that Petitioner had failed to show that he

21  was prejudiced by counsel's failure to give the instruction in question, reasoning that good character

22  evidence was largely irrelevant to the issues actually found by the jury and that nothing prevented the

23  jury from considering the evidence for whatever purpose and to whatever extent it felt was

24  appropriate.  (Lod. Docs., Vol. 1, Ex. 4 at 39-42.)

25       The law governing ineffective assistance of counsel claims is clearly established for the

26  purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d).  *Canales v. Roe*, 151

27  F.3d 1226, 1229 (9th Cir. 1998).  In a petition for writ of habeas corpus alleging ineffective

28  assistance of counsel, the court must consider two factors.  *Strickland v. Washington*, 466 U.S. 668,

687 (1984); *Lowry v. Lewis*, 21 F.3d 344, 346 (9th Cir. 1994).  First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment.  *Strickland*, 466 U.S. at 687.  The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances.  *Id.* at 688; *United States v. Quintero-Barraza*, 78 F.3d 1344, 1348 (9th Cir. 1995).  Judicial scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.  *Strickland*, 466 U.S. at 687; *Sanders v. Ratelle*, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different."  *Strickland*, 466 U.S. at 694.  Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable.  *Id.* at 688.  The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness.  *Id.*; *Quintero-Barraza*, 78 F.3d at 1345; *United States v. Palomba*, 31 F.3d 1356, 1461 (9th Cir. 1994).

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies.  *Strickland*, 466 U.S. at 697.  Since the defendant must affirmatively prove prejudice, any deficiency that does not result in prejudice must necessarily fail.  However, there are certain instances which are legally presumed to result in prejudice, e.g., where there has been an actual or constructive denial of the assistance of counsel or where the State has interfered with counsel's assistance.  *Strickland*, 466 U.S. at 692; *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984).  Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of *Williams v. Taylor*, 529 U.S. 362 (2000).  *Weighall v. Middle*, 215 F.3d 1058, 1062 (9th Cir. 2000).

\\\

\\\

\\\

### 1.      Failure to request CALJIC 2.40

The Court finds that the state court's determination as to this issue was not unreasonable. The instruction Petitioner faults counsel for not requesting, CALJIC 2.40, reads in part as follows:

> Evidence has been received for the purpose of showing the good character of the defendant for those traits ordinarily involved in the commission of a crime, such as that charged in this case. [¶] Good character for the traits involved in the commission of the crime[s] charged may be sufficient by itself to raise a reasonable doubt as to the guilt of a defendant. It may be reasoned that a person of good character as to these traits would not be likely to commit the crime[s] of which the defendant is charged.

While the jury was not specifically instructed that good character evidence could be sufficient by itself to raise a reasonable doubt as to Petitioner's guilt, the jury was also not instructed to the contrary. Therefore, the jury was free to consider the good character evidence presented by Petitioner, including using the evidence as the sole basis for finding Petitioner not guilty. Petitioner has not shown that the failure to request the instruction was so serious that counsel was not functioning as the "counsel" guaranteed by the Sixth Amendment or a reasonable probability that the result would have been different if the instruction was requested and granted by the trial court. Consequently, the Court finds Petitioner cannot obtain relief on this ground.

### 2.      Failure to move for a new trial based on jury misconduct

As discussed *supra*, the evidence of jury committed misconduct is speculative as neither Ms. Benzler nor Ms. White can identify the source of this supposed definition. Consequently, Petitioner cannot establish that trial counsel's failure to move for a new trial based on jury misconduct was prejudicial as there is no evidence that such a motion would have been successful.

### C.      Ground Three

Petitioner argues that his rights to due process and a fair trial were violated when he was shackled in full view of the jury without any showing of manifest necessity or a lack of reasonable alternatives.

These claims were presented in a petition for writ of habeas corpus to the Fresno County Superior Court, which denied the petition in a reasoned opinion on November 3, 2003. (Lod. Docs., Vol. 1, Exs. 7-8.) The issues were then raised in a petition for writ of habeas corpus to the California Court of Appeal, which denied the petition in a reasoned opinion on February 20, 2004. (Lod. Docs., Vol. 1, Exs. 9-10.) The issues were then raised in a petition for writ of habeas corpus to the

1  California Supreme Court, which summarily denied the petition on April 13, 2005.  (Lod. Docs.,

2  Vol. 1, Exs. 11-12.)  The California Supreme Court, by its "silent order" denying the petition, is

3  presumed to have denied the claims presented for the same reasons stated in the opinion of the lower

4  court.  *Ylst v. Nunnemaker*, 501 U.S. at, 803.

5        The Court of Appeal's denial of Petitioner's claim rested primarily on their finding that

6  Petitioner failed to demonstrate prejudice resulting from the jury viewing him in shackles.  (Lod.

7  Docs., Vol. 1, Ex. 10 at 2).  The Supreme Court has long recognized that a defendant may be

8  shackled in view of the jury "only in the presence of a special need."  *Deck v. Missouri*, 544 U.S.

9  622, 626 (2005); *see Estelle v. Williams*, 425 U.S. 501, 504-505 (1976) (defendant may not normally

10 be forced to appear in court in shackles or prison garb); *see also Larson v. Palmateer*. 515 F.3d

11 1057, 1062 (9th Cir. 2008) (citing *Deck*, 544 U.S. at 630-631 in stating, "[v]isible shackling of a

12 criminal defendant during trial "undermines the presumption of innocence and the related fairness of

13 the factfinding process" and " 'affront[s]' the 'dignity and decorum of judicial proceedings that the

14 judge is seeking to uphold'").  As noted by the Ninth Circuit:

15        In order for a defendant to prevail on a claim of this nature, a court must find that the
          defendant was indeed physically restrained in the presence of the jury, that the
16        shackling was seen by the jury, and that the physical restraint was not justified by
          state interests.  Then, in order for the unjustified shackling to rise to the level of a
17        constitutional error, the defendant must make a showing that he suffered prejudice
          [under *Brecht*] as a result.
18
   *Ghent v. Woodford*, 279 F.3d 1121, 1132 & n.9 (9th Cir. 2002) (citations omitted).
19
20        Thus, a habeas petitioner must also show that the visible shackling had a "substantial and

21 injurious effect or influence in determining the jury's verdict."  *Brecht*, 507 U.S. at 623.

22        The Court finds that the state court's determination of Petitioner's claim was not objectively

23 unreasonable.  Jurors Herzog and White both stated that they saw Petitioner in handcuffs in the

24 courtroom on one occasion, but both acknowledged that they were taken off shortly after Petitioner

25 entered.  (Exhibits in Support of Petition, Interview of Herzog at 10:17-11:1; Interview of White at

26 5:13-26.)  Juror White further stated that "it appeared to me that they just forgot to take them off

27 when he came into the courtroom."  (Exhibits in Support of Petition, Interview of White at 5:24-26.)

28 Juror De La Cruz did not see Petitioner in handcuffs and Juror Benzler said that she believed she

remembered seeing Petitioner in handcuffs in the courtroom.  (Exhibits in Support of Petition,

1   Interview of De La Cruz at 4:19-5:3; Interview of Benzler at 9:19-10:7.)  All the jurors who

2   witnessed Petitioner in handcuffs averred that the incident neither prejudiced them against Petitioner

3   nor did they consider the shackling to be prejudicial to Petitioner.  (Exhibits in Support of Petition,

4   Interview of Herzog at 11:2-8; Interview of White at 5:19-6:21; Interview of Benzler at 10:8-9).

5   Petitioner has not shown that the isolated incident of being exposed to the jury in handcuffs

6   substantially and injuriously affected the verdict, as there is no evidence that the jury discussed the

7   issue during deliberations or considered the incident to be significant.

8        **_D.        Evidentiary Hearing_**

9        Petitioner argues that, at the very least, he is entitled to an evidentiary hearing on his claims

10   as he has made a prima facie case of juror misconduct, ineffective assistance, and due process

11   violations.

12        "On collateral review of a state court conviction, a federal court must consider whether [an

13   evidentiary] hearing could enable an applicant to prove the petition's factual allegations, which, if

14   true, would entitle the applicant to federal habeas relief."  *Estrada*, 512 F.3d at 1235.  As noted

15   above, the Court has conducted an evidentiary hearing on the issue of the jury obtaining and using

16   extraneous definitions of voluntary and involuntary manslaughter.  Petitioner is not entitled to an

17   evidentiary hearing on his other claims as he has not made a colorable claim of prejudice resulting

18   from the alleged violations that would entitle him to habeas relief.

19        **_E.        Respondent's Statute of Limitations Defense_**

20        Respondent's answer to the petition did not raise the affirmative defense of statute of

21   limitations.  However, Respondent requested leave to file a motion to dismiss the petition as time

22   barred on May 31, 2006, arguing that the defense was not viable until the Supreme Court's decision

23   in *Evans v. Chavis*, 546 U.S. 189 (2006).  (Court. Doc. 23).  Petitioner objected to the motion,

24   arguing in part that he would be greatly prejudiced if the motion were entertained at this juncture.

25   (Court Doc. 26).  Finding both arguments persuasive, the Court construed Respondent's motion as a

26   supplement to the answer, permitted Petitioner to file a supplement to the traverse, and held that the

27   issue would be addressed along with the merits of the petition.  (Court. Doc. 28).

28   \\\

1    Consequently, the Court now addresses whether Petitioner's claims are barred by the statute

2 of limitations contained in AEDPA.  AEDPA imposes a one-year limitations period on petitioners

3 seeking to file a federal petition for writ of habeas corpus. 28 U.S.C. § 2244(d)(1).  Section 2244,

4 subdivision (d)(1) states that the limitation period shall run from the latest of the following:

5
         (A) the date on which the judgment became final by the conclusion of direct review or
6        the expiration of the time for seeking such review;

7        (B) the date on which the impediment to filing an application created by State action
         in violation of the Constitution or laws of the United States is removed, if the
8        applicant was prevented from filing by such State action;

9        (C) the date on which the constitutional right asserted was initially recognized by the
         Supreme Court, if the right has been newly recognized by the Supreme Court and
10       made retroactively applicable to cases on collateral review; or

11       (D) the date on which the factual predicate of the claim or claims presented could
         have been discovered through the exercise of due diligence.

12 28 U.S.C. § 2244(d)(1).

13    In most cases, the one-year limitations period begins running on the date the petitioner's

14 direct review becomes final.  *See* 28 U.S.C. § 2244(d)(1)(A).  Here, the California Supreme Court

15 denied Petitioner's petition for direct review on August 14, 2002.  Thus, direct review concluded on

16 November 12, 2002, when the ninety-day period for seeking review in the United States Supreme

17 Court expired.  *Barefoot v. Estelle,* 463 U.S. 880, 887 (1983); *Bowen v. Roe,* 188 F.3d 1157, 1159

18 (9th Cir. 1999).  Petitioner therefore had one year from November 13, 2002, or until November 13,

19 2003, absent applicable tolling, to file his federal petition.

20          ***1.      Statutory tolling under 28 U.S.C. § 2244(d)(2)***

21    Title 28 U.S.C. § 2244(d)(2) states that "[t]he time during which a properly filed application

22 for State post-conviction or other collateral review with respect to the pertinent judgment or claim is

23 pending shall not be counted toward any period of limitation under this subsection."  28 U.S.C. §

24 2244(d)(2).  An application may be considered pending during the time between the denial of an

25 application in a lower state court and the filing of an application for relief in a higher court.  *See*

26 *Carey v. Saffold*, 536 U.S. 214, 219-21 (2002).  However, in *Evans v. Chavis*, the United States

27 Supreme Court held that a California state prisoner was not entitled to statutory tolling under the

28 AEDPA where there was an unjustifiable six month delay between the denial of his petition for writ

1   of habeas corpus in the California Court of Appeal and the filing of his petition for relief in the

2   California Supreme Court, as his petition was not "pending" due to the unreasonable delay.  *Evans v.*

3   *Chavis*, 546 U.S. 189, 201 (2006).  The Supreme Court, recognizing that California did not have

4   strict time deadlines for the filing of a habeas petition at the next appellate level, indicated that most

5   states provide for a shorter period of 30 to 60 days within which to timely file a petition at the next

6   appellate level.  *Id*.

7           Here, Petitioner filed his first state habeas petition in the Fresno County Superior Court on

8   October 10, 2003, with 33 days remaining on the AEDPA's statute of limitations.  There was a 63-

9   day gap between the denial of the Superior Court petition and the filing of the Court of Appeal

10  petition, a 70-day gap between the denial of the Court of Appeal petition and the filing of the

11  California Supreme Court petition, and a 20-day gap between the denial of the California Supreme

12  Court petition and the filing of the instant petition.  The timeliness of the instant petition therefore

13  turns on the reasonableness of the 63 and 70-day gaps.

14          Under the guidance of *Evans,* which requires the district court to conduct its own

15  independent inquiry into the timeliness of a state petition when it is denied without an express

16  finding as to timeliness, the Court finds the 70-day gap to be unreasonable as Petitioner has not

17  provided adequate justification for waiting that length of time to file the same petition in the

18  California Supreme Court that he filed in the Court of Appeal.  *Evans v. Chavis*, 546 U.S. 189, 198-

19  200 (2006); *see Hunt v. Felker*, 2008 WL 364995, *4 (E.D. Cal. 2008) (finding delay of 70 days

20  unreasonable); *Culver v. Director of Corrections*, 450 F.Supp.2d 1135, 1140-41 (C.D. Cal. 2006)

21  (finding delay of 71 days unreasonable); *Livermore v. Watson*, 556 F.Supp.2d 1112, 1117 (E.D.Cal.

22  2008) (finding seventy-eight day delay unreasonable); *Bridges v. Runnels*, 2007 WL 2695177, *2

23  (E.D. Cal. 2007) (finding delay of 76 days unreasonable).  Consequently, Petitioner is not entitled to

24  statutory tolling for the 70-day period and the petition is untimely.

25                    ***2.      Equitable tolling***

26          The limitations period is subject to equitable tolling if "extraordinary circumstances beyond a

27  prisoner's control" have made it impossible for the petition to be filed on time.  *Calderon v. U.S.*

28  *Dist. Ct. (Kelly)*, 163 F.3d 530, 541 (9th Cir. 1998).  "When external forces, rather than a petitioner's

1   lack of diligence, account for the failure to file a timely claim, equitable tolling of the statute of

2   limitations may be appropriate." *Miles v. Prunty*, 187 F.3d 1104, 1107 (9th Cir. 1999).  Here,

3   Petitioner has not identified any external forces beyond his control that prevented him from filing a

4   timely petition; thus Petitioner is not entitled to equitable tolling and his petition remains untimely.

5   **RECOMMENDATION**

6         Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be

7   DENIED WITH PREJUDICE and the Clerk of Court be DIRECTED to enter judgment for

8   Respondent.

9         This Findings and Recommendation is submitted to the Honorable Oliver W. Wanger, United

10   States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304

11   of the Local Rules of Practice for the United States District Court, Eastern District of California.

12   Within thirty (30) days after being served with a copy, any party may file written objections with the

13   court and serve a copy on all parties.  Such a document should be captioned "Objections to

14   Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and

15   filed within ten (10) <u>court</u> days (plus three days if served by mail) after service of the objections.

16   The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The

17   parties are advised that failure to file objections within the specified time may waive the right to

18   appeal the District Court's order.  *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).

19

20   <u>IT IS SO ORDERED.</u>

21   **Dated:       December 11, 2009                              /s/ John M. Dixon**
        UNITED STATES MAGISTRATE JUDGE

22

23

24

25

26

27

28